## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CONAN DOYLE ESTATE LTD., <br><br> PLAINTIFF, <br><br> V. <br><br> THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A, <br><br> DEFENDANTS. | CASE NO.: 1:21-CV-00929 <br><br> JUDGE MATTHEW F. KENNELLY <br><br> MAGISTRATE JUDGE YOUNG B. KIM |

## DECLARATION OF PAUL VARLEY

I, Paul Varley, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am a consultant for Conan Doyle Estate Ltd. ("Conan Doyle Estate"), which is based in United Kingdom. I am knowledgeable about or have access to business records concerning all aspects of the brand protection operation of Conan Doyle Estate including, but not limited to, its trademarks, other intellectual property, sales, on-line sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge save where otherwise stated.

3. The Conan Doyle Estate is formed from the family of Sir Arthur Conan Doyle. Sir Arthur Ignatius Conan Doyle is best known for his creation of the detective Sherlock Holmes— one of the most vivid and enduring characters in English fiction.

4. The Estate manages the literary, merchandising, and advertising rights in Sir Arthur Conan Doyle's works and all characters, including trademark and common law rights in the name and image of Sherlock Holmes characters in the USA, European Union, U.K. and many other countries around the world.

5. Plaintiff specializes in the creation, manufacture, marketing, and licensing of all products that feature the trademarks associated with and owned by Conan Doyle Estate (collectively referred to as "Sherlock Holmes Products"). Conan Doyle Estate is in the business of developing, marketing, and licensing Sherlock Holmes Products.

6. The Conan Doyle Estate's Products and other similar products featuring Sherlock Holmes branding have found incredible success and appreciation worldwide.

7. Conan Doyle Estate is the licensor of all Sherlock Holmes Products available in stores and on various e-commerce platforms.

8. Conan Doyle Estate Ltd. is the owner of the trademark registrations for Sherlock Holmes, which are covered by U.S. Trademark Registration Nos. 5,906,240; 4,690,745; 4,313,984; and 5,396,601 (collectively, the "Sherlock Holmes Trademarks").

9. The above registrations for Conan Doyle Estate are valid, subsisting, and in full force and effect. True and correct copies of the federal trademark registration certificates for the above Sherlock Holmes Trademarks are attached hereto as **Exhibit 1**.

10. The Sherlock Holmes Trademarks are distinctive and identifies the merchandise as goods from Conan Doyle Estate. The Sherlock Holmes Trademarks have been continuously used and never abandoned.

11. Conan Doyle Estate has expended time, money, and other resources in developing,

advertising, and otherwise promoting the Sherlock Holmes Trademarks. As a result, products bearing the Sherlock Holmes Trademarks are recognized and exclusively associated by consumers, the public, and the trade as being products sourced from Conan Doyle Estate. Conan Doyle Estate has ensured that products bearing its IP are manufactured to the highest quality standards. As such, the recognition and goodwill associated with the brand is of incalculable and inestimable value to Conan Doyle Estate.

12. The success of the Sherlock Holmes brand has resulted in its significant counterfeiting. Consequently, Conan Doyle Estate is implementing an anti-counterfeiting program by investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Conan Doyle Estate Ltd. has identified numerous domain names linked to fully interactive websites and marketplace listings on various platforms, including the Internet stores operating under the domain names and/or the online marketplace accounts identified in Schedule A which is attached to the Complaint (collectively, the "Defendant Internet Stores" or "Seller Aliases"), which are offering for sale, selling, and importing counterfeit products in connection with the Sherlock Holmes Trademarks (the "Counterfeit Sherlock Holmes Products") to consumers in this Judicial District and throughout the United States. Despite Conan Doyle Estate's enforcement efforts online, Defendants have persisted in creating the Defendant Internet Stores.

13. I perform, supervise, and/or direct investigations related to Internet-based infringement of the Sherlock Holmes Trademarks. Our investigation shows that Defendants are using the Defendant Internet Stores to sell Counterfeit Sherlock Holmes Products from foreign countries, such as China, to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the Defendant Internet Stores and determined that Counterfeit Products were being offered for sale to the United States, including Illinois. This conclusion was

reached through visual inspection of the products listed for sale, the price at which the Counterfeit Sherlock Holmes Products were offered for sale, other features commonly associated with websites selling counterfeit products, because Defendants offered shipping to the United States, including Illinois, and because Defendants and their websites do not conduct business with Conan Doyle Estate, and do not have the right or authority to use the Sherlock Holmes Trademarks for any reason. True and correct copies of screenshot printouts showing the active Defendant Internet Stores reviewed are attached as **Exhibit 2.**

      14.    Upon information and belief, Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers selling genuine Sherlock Holmes Products. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union, Amazon and PayPal, among others. The Defendant Internet Stores often include images and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website. Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos. Conan Doyle Estate has not licensed or authorized Defendants to use its Sherlock Holmes Trademarks, and none of the Defendants are authorized retailers of genuine Sherlock Holmes Products.

      15.    Upon information and belief, Defendants also deceive unknowing consumers by using the Conan Doyle Estate IP without authorization within the content, text, and/or meta tags of their websites, in order to attract and manipulate search engines into identifying Defendants' Online Stores as legitimate websites for Sherlock Holmes Products. Defendants also employ other

unauthorized search engine optimization ("SEO") tactics and social media spamming so that Defendant Internet Stores show up at or near the top of relevant search results, including tactics to propel new domain names to the top of search results after others are shut down. These tactics are meant to, and are successful in, misdirecting consumers who are searching for genuine Sherlock Holmes Products.

16. Defendants often go to great lengths to conceal their identities by using multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores. Other Defendant Internet Stores often use privacy services that conceal the owners' identity and contact information. Upon information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule "A" to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

17. There are numerous similarities among the Defendant Internet Stores. For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names. In addition, Counterfeit Sherlock Holmes Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Sherlock Holmes Products were manufactured by and come from a common source and that, upon information and belief, Defendants are interrelated. The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user- defined

variables, domain redirection, lack of contact information, identically or similarly priced similar hosting services, similar name servers, and the use of the same text and images. Defendants use of Plaintiff's Trademarks is identical in appearance, and done so in a manner, which suggests to the consumer, that the source or origin of the Counterfeit Sherlock Holmes Products is Conan Doyle Estate. Additionally, Defendants' Counterfeit Sherlock Holmes Products are intentionally designed to look identical or similar to genuine Sherlock Holmes Products.

18. Defendants in this case, and defendants in other similar cases against online counterfeiters, use a variety of other common tactics to evade enforcement efforts. For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit. Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received. Rogue servers are notorious for ignoring take down demands sent by brand owners. Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.

19. Counterfeiters such as Defendants typically operate multiple credit card merchant accounts as well as Amazon, Alipay, WISH, and/or PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Conan Doyle Estate's enforcement efforts. Upon information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal, or similar accounts, to off-shore bank accounts outside the jurisdiction of this Court.

20. Monetary damages alone cannot adequately compensate Conan Doyle Estate Ltd. for ongoing infringement because monetary damages fail to address the loss of control of and damage to Conan Doyle Estate's reputation and goodwill. Furthermore, monetary damages are

difficult, if not impossible, to completely ascertain due to the inability to fully quantify the monetary damage caused to Conan Doyle Estate's reputation and goodwill by acts of infringement.

21. Conan Doyle Estate's goodwill and reputation are irreparably damaged when the Sherlock Holmes Trademarks are used on goods not authorized, produced, or manufactured by Conan Doyle Estate. Moreover, consumer brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to Conan Doyle Estate's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

22. Conan Doyle Estate is further irreparably harmed by the unauthorized use of the Sherlock Holmes Trademarks because counterfeiters take away Conan Doyle Estate's ability to control the nature and quality of products bearing the Sherlock Holmes Trademarks. Loss of quality control over goods bearing the Sherlock Holmes Trademarks and, in turn, loss of control over our reputation is neither calculable nor precisely compensable.

23. The sale of Counterfeit Sherlock Holmes Products bearing the Sherlock Holmes Trademarks also causes consumer confusion, which weakens Sherlock Holmes brand recognition and reputation. Consumers who mistakenly believe that the Counterfeit Sherlock Holmes Products they have purchased originated from Conan Doyle Estate will come to believe that Conan Doyle Estate offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with genuine Sherlock Holmes Products, resulting in a loss or undermining of Conan Doyle Estate's reputation and goodwill.

24. Conan Doyle Estate is further irreparably damaged due to a loss in exclusivity. The Sherlock Holmes Products and the use of Sherlock Holmes Trademarks are meant to be exclusive. Conan Doyle Estate's marketing and distribution of Sherlock Holmes Products are aimed at

growing and sustaining sales of Sherlock Holmes Products. The Sherlock Holmes Trademarks are distinctive and signify to consumers that the products originate from Conan Doyle Estate, and are manufactured to Conan Doyle Estate's quality standards. When counterfeiters use the Sherlock Holmes Trademarks on goods without Conan Doyle Estate's authorization, the exclusivity of Sherlock Holmes Products, as well as Conan Doyle Estate's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

25. Conan Doyle Estate will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 22, 2021.

*/s/ Paul Varley*
Paul Varley